558 S.E.2d 921

**Roderick MEANS, Appellant,**

v.

**Richard GATES, Respondent.**

**No. 3427.**

Court of Appeals of South Carolina.

Heard Dec. 5, 2001.

Decided Dec. 31, 2001.

Jody V. McKnight, of Riesen Law Firm, of North Charleston, for appellant.

John L. McDonald, Jr., of Clawson & Staubes, of Charleston, for respondent.

ANDERSON, J.

This is a negligence action in which Roderick Means obtained a verdict of $25,000 against Richard Gates for injuries he sustained in an automobile accident. Means appeals, alleging the trial court erred in excluding the testimony of his expert witness, a neuropsychologist, which was offered to rebut Gates' implication that Means' physical symptoms were not genuine. Means contends the exclusion of this evidence prejudiced his case and resulted in a lower jury verdict. We reverse and remand.

## FACTS/PROCEDURAL BACKGROUND

This appeal arises out of a three-car chain collision that occurred on August 29, 1996, when Gates ran into the back of another vehicle, which in turn struck Means' vehicle from behind. After the accident, Means was treated for lower back and shoulder pain, as well as numbness in his arms and legs.

Means filed this negligence action against Gates, alleging he suffered physical injury, mental distress, lost wages, and substantial expenditures for past and future medical treatment. In his amended answer, Gates admitted simple negligence in causing the accident, but asserted "Absence of Injuries" as a defense.

At trial, Means testified that he experienced chronic lower back pain as a result of the accident, which interfered with his daily activities and caused him distress. Means stated he had incurred medical expenses of $28,951.34 and lost wages of $1,791.77 to date.

Dr. Gregory Jones, Means' primary treating physician, diagnosed Means with an annular (outer layer) tear and herniated discs in the thoracic, lumbar, and sacrum regions of his spine, along with nerve root compromise. Dr. Jones stated Means probably would require nerve blocks indefinitely to control his pain, a maximum of four a year, at a cost of more than $1,000 per procedure. Dr. Jones stated—to a reasonable degree of medical certainty—that the symptoms generated from Means' disc herniation were a direct result of the August 1996 automobile accident. Dr. Jones assigned Means a 10 percent impairment rating to the lower back and legs.

The defense asserted Means' physical problems predated the August 1996 collision and that the impact was not significant enough to cause the injuries described by Means' treating physician. Gates hired Dr. Robert Sopka to perform an analysis of the forces involved in the impact. Dr. Sopka is a physics professor and department chair at the Community College of Baltimore County in Catonsville, Maryland with experience in analyzing the physics of motor vehicle collisions. Dr. Sopka testified he additionally worked for Forensic Technologies, a litigation-services group, as a senior physicist, but was not a certified accident reconstructionist.

In a videotaped deposition, Dr. Sopka testified in detail about what he considered the fairly insignificant forces of impact of the "low-speed" accident. Dr. Sopka stated he had reviewed the police report and analyzed the weights of the vehicles and the passengers; further, he had considered the characteristics of the particular makes of vehicles involved in the accident and how they respond to impact, i.e., "how crushable a vehicle is." Dr. Sopka concluded "that the speed change of Mr. Means' Dodge Ram Charger [from the three-car collision] could have been no more than 5.2 miles per hour in a forward direction" and "that the G forces experienced during this collision were no more than 2.4 Gs, again, in the forward direction." Dr. Sopka described one G as the normal acceleration of a falling object caused by gravity. Dr. Sopka observed, "If there's less impact, then there's less crush, and that's the sort of thing we need to evaluate."

Gates also retained a radiologist, Dr. Barry F. Jeffries, to testify regarding what, if any, injuries were caused by the

automobile accident. Dr. Jeffries specializes in neuroradiology and is licensed in Georgia and Missouri. Dr. Jeffries explained "[n]euroradiology is that branch of diagnostic radiology that is concerned with the brain, the spinal cord, and the bony covering, such as the skull and the spine. It also includes ... [t]he structures of the face and the neck." Dr. Jeffries reviewed Means' X-rays and MRI scans and opined that Means' annular tear, disc herniation, and nerve root impingement were the result of a natural degenerative process and not caused by the August 1996 collision.

To rebut this testimony, Means attempted to introduce the videotaped deposition testimony of a neuropsychologist, Dr. Randolph Waid, who stated to a reasonable degree of medical certainty in the field of clinical psychology that Means suffered from "chronic pain syndrome" that negatively impacted his ability to pursue social, recreational, and vocational activities. He further opined the chronic pain was probably caused by the August 1996 automobile accident. Dr. Waid concluded Means' physical symptoms appeared genuine and not the result of any psychological disturbance. The trial court ruled the deposition was inadmissible. The jury thereafter returned a verdict for Means of $25,000. This appeal followed.

## LAW/ANALYSIS

On appeal, Means contends the trial court erred in refusing to admit any portion of the videotaped deposition of the neuropsychologist who performed a series of psychological tests on him after the accident. Means contends the testimony was necessary to rebut Gates' implication that his injuries were not as severe as he had alleged and were the result of malingering. He contends the exclusion of the testimony was prejudicial and resulted in a jury verdict that was less in dollar amount than the sum of his medical bills. We agree with Means that the exclusion of Dr. Waid's testimony constituted an abuse of discretion and therefore reverse and remand for a new trial.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testi-

fy thereto in the form of an opinion or otherwise." Rule 702, SCRE.

■ The admission or exclusion of expert testimony is a matter within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent an abuse of discretion. *Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205 (1998); *Creed v. City of Columbia*, 310 S.C. 342, 426 S.E.2d 785 (1993); *Gazes v. Dillard's Dep't Store, Inc.*, 341 S.C. 507, 534 S.E.2d 306 (Ct.App.2000); *Hundley v. Rite Aid of S.C., Inc.*, 339 S.C. 285, 529 S.E.2d 45 (Ct.App.2000), *cert. filed.*

■ A court's ruling on the admissibility of a neuropsychologist's testimony constitutes an abuse of discretion where the ruling is manifestly arbitrary, unreasonable, or unfair. *Huntoon v. TCI Cablevision of Colo., Inc.*, 969 P.2d 681 (Colo.1998) *(en banc)*. "Before the Court of Appeals will reverse a judgment for an alleged error in the exclusion of evidence, the appellant must show prejudice." *Potomac Leasing Co. v. Bone*, 294 S.C. 494, 497, 366 S.E.2d 26, 28 (Ct.App. 1988).

Dr. Waid has a bachelor's degree in general psychology from Temple University, a master's degree in psychology from the University of Richmond, and a doctorate in clinical psychology from the University of North Texas following an internship at the Medical University of South Carolina in Charleston ("MUSC").

Dr. Waid worked as the director of psychological services at a private psychiatric facility in Dallas, Texas before returning to Charleston in 1982 to join MUSC's faculty in the departments of psychiatry and neurology. In 1989, he became the director of MUSC's assessment center, where he ran a clinic providing assessments for conditions such as chronic pain, neurological disorders, and psychiatric disorders. In 1998, Dr. Waid became a clinical associate professor in psychiatry and neurology at MUSC and opened a private practice in Mount Pleasant. Dr. Waid is not a medical doctor and is not licensed to prescribe medications.

In his videotaped deposition, Dr. Waid testified Means was referred to him in April 1997 for evaluation of continuing pain and lower back problems after extensive medication, physical

therapy, and diagnostic procedures had failed to provide relief. Means was referred to the doctor "to assess for any associated psychological problems along with his chronic pain syndrome and to make recommendations with regard to Mr. Means' rehabilitation needs."

As part of the evaluative process, Dr. Waid gave Means "a battery of psychological tests, primarily to measure for psychiatric difficulties, specifically to measure for depression and anxiety, as well as to measure his complaints related to pain and how they are affecting his life." Dr. Waid testified he "performed . . . a very extensive broad based psychological test . . . [called] the Personality Assessment Inventory. It's made up of numerous scales measuring areas of clinical symptomatology. The individual generally has to respond to this rather extensive test in terms of whether the statement is false, slightly true, mainly true, or very true." This test is used to tell "where a person is functioning in different areas of symptomatology."

Dr. Waid stated the test revealed Means "really had no significant elevations that would be suggestive of a psychiatric disturbance." Means did have "moderate elevations consistent with his complaints . . . about physical functioning; health; and persistent pain . . . ." The test results also indicated there "was some mild or transient depression and anxiety" associated with this condition.

Dr. Waid concluded, "In my opinion[,] Mr. Means was suffering from a chronic pain syndrome that had resulted in a negative impact in his ability to pursue . . . social, recreational, [and] vocational activities." He stated to a reasonable degree of professional certainty in the field of clinical psychology that the automobile accident of August 29, 1996, probably caused Means' chronic pain syndrome and related difficulties. He further averred he found no reason to believe Means' complaints of pain were not genuine.

Dr. Waid opined Means was "a very good candidate" for using techniques for chronic pain management, including psychological strategies, education, a review of potential medications, electrostimulation, acupuncture, and other methods to assist Means in coping and living with pain more effectively based on Means' "willingness not to overuse medication, his

desire to cope and [to] continue ... as best he could ...."
Dr. Waid thought Means would benefit from an outpatient
chronic pain rehabilitation program directed by William Key
at MUSC, with an estimated cost of around $6,000.

The trial court reviewed the entire videotaped deposition
and ruled it was inadmissible. The court acknowledged Dr.
Waid had conducted tests and there was "nothing to suggest
the tests were not conducted in accordance with [the] accept-
able standard[s] of his practice and profession nor that the
results were not useful or beneficial." However, the court felt
Dr. Waid had not formed a diagnosis, and because he had
referred Means to another psychologist, Dr. Key, there was
the indication that Dr. Waid "really wasn't treating at all."
The court noted "[t]he essence of [Dr. Waid's] testimony is
that he believed the plaintiff and believed that he certainly
was suffering from pain. And there's no question that this
pain caused him great anxiety and he talked about the rea-
sons, the psychological reasons for that .... Other than that,
his testimony dealt with a—really a variety of questions,
[including] malingering .... Just a litany of ... matters of
really no useful benefit in this case."

The trial court stated although Dr. Waid's opinion that
Means was not a malingerer would probably be admissible, he
had heard nothing to suggest by way of cross-examination or
otherwise that Means was a malingerer. The trial judge
concluded the testimony was not admissible because Dr. Waid
was not really rendering any treatment to Means and the
court was unsure of the purpose for the testimony.

■ In this case, Means was offering the expert testimony
of neuropsychologist Dr. Waid to show: a battery of tests had
revealed no psychiatric reason for his physical ailments;
Means was suffering from chronic pain syndrome, which is a
psychological condition, although not a condition of distur-
bance; and this condition was caused by the August 1996
automobile accident involving Gates. Means contends this
testimony was essential to rebut Gates' experts and prejudiced
the presentation of his case, as evidenced by the jury's low
verdict.

In contrast, Gates contends the trial court properly exclud-
ed the evidence because it was not relevant and, even if

admissible, was more prejudicial than probative. *See* Rule 401, SCRE (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); Rule 402, SCRE ("Evidence which is not relevant is not admissible."); Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

"A neuropsychologist is a specialist in the area of clinical psychology, a discipline which focuses on the brain and behavioral relationships of individuals who have brain impairment due to dementia, head injury or other kinds of brain disease." *Cunningham v. Montgomery*, 143 Or.App. 171, 921 P.2d 1355, 1357 (1996).

In *Howle v. PYA/Monarch, Inc.*, 288 S.C. 586, 593, 344 S.E.2d 157, 160 (Ct.App.1986), this Court observed: "Psychologists have been allowed to give expert opinions as to mental and emotional condition, and often causation, in many different types of cases." (citations omitted). We further stated:

Section 40–47–40, which defines the term "practice of medicine," neither expressly nor implicitly bars a psychologist from testifying as to diagnosis, prognosis, and causation. A psychologist is not incompetent to give his opinion simply because he is not a licensed medical doctor. At most, a psychologist's lack of a medical license affects his credibility and is a proper subject for cross-examination and for comment during jury argument.

Section 40–55–50, which defines the practice of psychology, likewise neither expressly nor implicitly bars a psychologist from giving testimony as to diagnosis, prognosis, and causation. Indeed, Section 40–55–60, another statute included among those that regulate the practice of psychology, *contemplates that a psychologist may "diagnose, prescribe for, treat or advise a client with reference to complaints" embraced by psychological practice* "as determined by the Board [of Examiners in Psychology]."

*Id.* at 594, 344 S.E.2d at 161 (emphasis added) (citations omitted) (alteration in original).

In *Howle,* we held: "[A] psychologist, once qualified as an expert witness by reason of education, training, and experience, is competent to testify as to diagnosis, prognosis, and causation of mental and emotional disturbance." *Id.* (citation omitted).

We note the narrow question on appeal is not the sufficiency of Dr. Waid's professional qualifications or whether his testimony is outside the limits of psychological practice. The trial court expressly acknowledged that Dr. Waid's testimony would be admissible to rebut an accusation of malingering and, contrary to the court's determination, we conclude this is precisely the implication raised by Gates when he pled "Absence of Injuries" as a defense and presented expert witnesses who asserted: (1) the collision was one of low impact; and (2) that there was no medical basis for Means' claim that the automobile accident caused his symptoms.

We further conclude the determination whether Means suffered from a condition of "chronic pain syndrome" and whether his symptoms had their genesis in a psychological cause were areas within the expertise of the neuropsychologist. Any flaws in Dr. Waid's analysis would go to the weight and credibility of his testimony, not its admissibility, and this expert testimony would supply specialized knowledge that would aid the jury in determining a fact in issue. *See* Rule 702, SCRE (providing a qualified expert may testify when "scientific, technical, or specialized knowledge will assist the trier of fact ... to determine a fact in issue"); *Huntoon v. TCI Cablevision of Colo., Inc.,* 969 P.2d 681 (Colo.1998) (*en banc* ) (holding the trial court did not abuse its discretion by admitting neuropsychologist testimony, which explained the use of a battery of tests to determine the impact of an injurious event on an individual's ability to carry out everyday activities and identified the causation of the plaintiff's organic brain injury); *Sanchez v. Derby,* 230 Neb. 782, 433 N.W.2d 523 (1989) (finding the trial court abused its discretion in excluding the testimony of a neuropsychologist that a motorist's behavioral changes were caused by either a combination of post-traumatic stress disorder and chronic pain syndrome or an organic affective disorder secondary to a mild brain

injury—the appellate court stating the dispositive issue was whether the testimony would supply specialized knowledge that would assist the jury in determining a fact in issue).

■ Finally, we find exclusion of the evidence was not harmless error as there was no equivalent testimony presented to this effect. *Cf. Bernard v. Lott*, 666 So.2d 702 (La.Ct. App.1995) (holding the exclusion of a neuropsychologist's opinion regarding whether the plaintiff suffered a brain injury on the basis she was not a medical doctor was harmless error because additional medical experts testified about how the results of the neuropsychologist's testing supported a finding of a brain injury). Accordingly, we hold the trial court erred in excluding the videotaped deposition of Dr. Waid.

## CONCLUSION

Based on the foregoing, we conclude the exclusion of the neuropsychologist's testimony was reversible error warranting a new trial.

**REVERSED and the case is REMANDED for trial.**

CONNOR and HOWARD, JJ., concur.